392 So.2d 938 (1980)
ALLSTATE INSURANCE COMPANY, Appellant,
v.
Raymond BIDDY and Linda Biddy, His Wife, Appellees.
No. 80-1361.
District Court of Appeal of Florida, Second District.
December 19, 1980.
Rehearing Denied January 27, 1981.
Robert C. Ward of Adams & Ward, Miami, for appellant.
H. Shelton Philips of Kaleel & Kaleel, P.A., St. Petersburg, for appellees.
GRIMES, Judge.
This is an appeal from an order finding Allstate Insurance Company and one of its employees in contempt and as a consequence entering a default against Allstate.
*939 On September 28, 1978, Raymond Biddy and his wife obtained a judgment in an automobile accident case against Fallon an Carr for $240,000 and against their liability insurer, Allstate, for $100,000, the limits of the Allstate policy. The Biddys then sued Allstate for the excess alleging that Allstate had failed to settle the case as the result of negligence and bad faith.
On August 31, 1979, the Biddys' counsel served a notice of taking deposition on William Holloway, the regional vice president of Allstate for the region which includes Florida. The notice requested that Holloway produce Allstate's claim files relating to the Biddy v. Fallon case. Allstate filed a motion for a protective order on the ground that Holloway knew nothing about the matter. The Biddys' counsel responded by stating that he wanted to depose Holloway because he wanted the main officer of Allstate in Pinellas County to produce the records. He renoticed Holloway and again requested the same files. Allstate through Holloway and its attorney, A.C. Shields, then produced all of Allstate's master file except for a posttrial report of its trial attorney, Don Bulleit, which it withheld on the ground that Bulleit prepared the report after the verdict.
On October 24, 1979, the Biddys' counsel filed a motion to compel discovery, alleging that Allstate had failed to produce all of its files, including the field claims representative's trial summary. The court granted the motion on January 10, 1980, and ordered production of all the documents specified in the notice of Mr. Holloway's deposition. The court further ruled that if no other material existed, Allstate should file an affidavit so stating. Pursuant to the order, Mr. Shields and Herbert Varneran, Allstate's claims agent in Wellsley, Massachusetts, who had handled the Biddy v. Fallon case, filed affidavits stating that additional material (Bulleit's posttrial report) had now been furnished but that there was no field claims representative's trial summary.
On February 26, 1980, the Biddys' counsel took the deposition of Wayne Dowling, a former employee of Allstate who had been the field claims representative monitoring the Biddy v. Fallon trial. Dowling produced a field claims representative's trial summary. Mr. Shields then sought to withdraw his affidavit, and the Biddys filed a motion to compel discovery and to take further depositions. The court entered orders to show cause against Mr. Varneran, Mr. Holloway and Allstate for their failure to produce the field claims representative's trial summary.
At the hearing on the show cause order, the evidence presented showed that Allstate handles suits in the district claims office in the district in which its insured resides. Thus, although the accident in the case of Biddy v. Fallon occurred in Pinellas County, Florida, the Massachusetts district office handled the case because Fallon resided in Massachusetts. The district claim office handling the claim opens what is known as a master file which should contain all correspondence, memoranda and documents pertaining to the case. If the district claim office handling the suit desires, it may request the district claims office in the area in which the suit is pending to monitor the case. When a district claims office is requested to do this, it opens an accommodation file.
Biddy v. Fallon was scheduled for trial in September 1978 in St. Petersburg. Just prior to trial, Mr. Varneran requested that the St. Petersburg district claims office designate a field claims representative to monitor the trial and report to him. Mr. Dowling was the representative chosen. Varneran testified that after the trial ended he told Dowling that since he had made notes of their several telephone conversations during the trial and since he was receiving a full trial report from Mr. Bulleit, there was no need for him to send a trial report. Varneran also said that he did not see Dowling's trial summary until March or April of 1980 after Dowling's deposition. He stated that under no circumstances should a trial summary be directed to personnel in St. Petersburg in a case handled by his office in Massachusetts.
*940 Mr. Varneran further testified that in September 1979 he came to Florida to bring the master file to Mr. Shields for the Holloway deposition and to look at the accommodation file in the St. Petersburg office to see that everything in that file was in his master file. He found nothing there that was not in the master file. He then turned the master file over to Shields for delivery to the Biddys' counsel. He said that while at the St. Petersburg office he did not check with Mrs. Galeener, the casualty unit manager, or with Robert Fletcher, the field unit manager, because he did not know that they had any connection with the Biddy file.
After Mr. Varneran had delivered the master file to Mr. Shields, Shields and Mr. Holloway went to the deposition and produced the file. Holloway testified that prior to this deposition he had no contact with the Biddy v. Fallon case. He stated that he understood that he was delivering a complete file.
Mr. Holloway further testified that after Mr. Dowling's employment with Allstate had been terminated on February 9, 1979, Dowling had requested a conference to discuss a number of grievances he had against Allstate. This meeting was held in May 1979, at which Holloway, Walter Maule, the southeastern zone security manager, Dowling, and Katherine Carr, a friend of Dowling, were present. Holloway said that the Biddy v. Fallon case was not discussed. Dowling testified that the case was not discussed by name, but Miss Carr stated that she thought the case was briefly mentioned as the Biddy case in the context of Dowling's complaint that Mrs. Galeener and others had tried to set him up to be fired.
Mr. Holloway also testified concerning his receipt of a letter dealing with some of Mr. Dowling's complaints against Allstate, to which a copy of Dowling's trial summary was attached. The letter dated June 6, 1979, was from D.R. Matte, the Florida regional claims manager, to Maule, with a copy to Holloway. Holloway said that since the letter had nothing to do with what he had discussed with Dowling and seemed to relate only to the claims division with which he was not involved, he did not think any more about it. Because the letter and the trial summary were not in his files, Holloway assumed that he threw them away, as he did with copies of most correspondence between two other department heads. He stated that he first heard of the existence of the Dowling summary after Dowling's deposition and that he immediately directed the attorneys to furnish it. He said he didn't question Mrs. Galeener before taking the master file, because it would not be standard procedure for her to have any file under the circumstances. He did not think of asking Dowling who was no longer employed by the company.
Sanford Shahan, a Florida regional claim analyst employed in the St. Petersburg office, testified that he had nothing to do with the Biddy v. Fallon file in the original suit. He said that his first contact with the Biddy v. Allstate excess case was when he received a call from K.D. Koenig, the home office staff counsel in Chicago, Illinois, who asked if an answer had been filed to the Biddys' complaint. Koenig's office had apparently become interested in the matter because of Allstate's potential exposure in the excess suit. Shahan then received a letter from Koenig dated July 12, 1979, which contained the observation that any portion of the file subsequent to the verdict should not ordinarily be subject to discovery. Koenig requested that Shahan have the accommodation file separated into two files, one for preverdict and one for postverdict material. Shahan said he instructed Robert Fletcher to start the second file. Fletcher kept the two files for a few weeks and then gave the postverdict volume to Shahan, who kept it in his office. Shahan never read the file and he did not know anything about Mr. Holloway's deposition or the dispute over the existence of the Dowling trial summary. When Mr. Shields came to see him after the Dowling deposition, he then looked in the postverdict volume and found Dowling's trial summary.
Wayne Dowling testified that Mrs. Galeener had requested him to prepare the *941 trial summary and address it to her. He said that he thought this request was out of the ordinary, because under normal procedure the summary should have been directed to Mr. Varneran. He said he took Mrs. Galeener's request to be a part of a continuing scheme to have him fired.
Linda Galeener testified that she had requested Mr. Dowling to make a summary. She thought that Mr. Fletcher had asked her to do so. She recalled receiving the report but said she did not know what she had done with it. She said that even though it would be normal procedure for the person in charge of the master file to receive a trial summary report, she did not remember forwarding it to Mr. Varneran. Fletcher, on the other hand, testified that he did not ask Mrs. Galeener for a trial summary.
Mr. Shields testified that he talked to both Mr. Varneran and Mr. Bulleit about any field claims representative's trial summary that might have been prepared. Neither were aware of any, and Varneran advised him that he had not requested Dowling to make one. Shields said he found the original of the summary at the Allstate office after Dowling's deposition.
Following the hearing, the court entered an order in which it determined that Mr. Varneran was not guilty of contempt of court, that Mr. Holloway was guilty of contempt which was technical in nature and required no penalties, and that Allstate was also guilty of contempt of court. The court struck Allstate's answer to count I of Biddy's amended complaint (compensatory damages) and entered a default judgment against Allstate on count I. It also awarded the Biddys attorney's fees incurred in connection with the discovery proceedings.
The trial court's order leaves us with three separate matters to consider: (1) the citation of contempt against Mr. Holloway, (2) the citation of contempt against Allstate, and (3) the penalties imposed upon Allstate.
In the order, the court made the following statement with respect to Mr. Holloway:
Had Holloway, with diligence, exercised the authority vested in him it can be concluded, absent collusion or concealment by subordinate employees, that the trial summary would have been produced. Holloway contends he acted reasonably in relying upon Allstate's counsel to furnish to him the materials he was required to produce without the necessity of any additional effort on his part. His position in this regard is untenable. It was unusual for Holloway to appear at such a deposition. This fact, together with the fact that this action seeks substantial damages to be awarded against Allstate itself and that Holloway's regional office was involved in the case is sufficient to put a reasonable man on notice of a necessity to investigate.
After a careful review of the evidence, we have reached the conclusion that it does not support the findings made by the trial court. Holloway had nothing to do with the Biddy v. Fallon case which was handled by the Massachusetts claims department with the help of the claims department in St. Petersburg with which he was not involved. It was Mr. Varneran who had charge of the Biddy v. Fallon case, and he did look in the accommodations file before turning the material over to Mr. Shields and Holloway. Moreover, Varneran later signed an affidavit along with Shields to the effect that there was no trial summary. Thus, it was reasonable for Holloway to assume that Allstate was producing all there was to produce. The fact that Holloway may have actually seen the trial summary several months earlier when he read a copy of a letter to which it was attached cannot alter this conclusion. The letter dealt not with the Biddy v. Fallon case but with a personnel matter concerning Mr. Dowling. Consequently, Holloway would not have had any reason to later connect the copy of the letter which he did not keep with the Biddy matter. Simply put, there was no evidence that Holloway wilfully ignored any order of the court. Therefore, the court was in error in holding him to be in contempt.
*942 The court's finding of contempt against Allstate is another matter. While there is evidence that no one employee of Allstate purposefully attempted to conceal the trial summary knowing that it should be produced, nonetheless Allstate must bear some responsibility for the fact that it had the trial summary in its possession and yet did not produce it after being ordered to do so. Perhaps it can be said that the failure to produce was linked to confusion among some of Allstate's employees as to whether the trial summary, being a document prepared after the verdict in the Biddy v. Fallon case, was protected from discovery.[1] Even so Allstate was under order to produce a category of documents which included the trial summary. While the employees of Allstate directly involved in the production of documents may not have had personal knowledge of the trial summary, they were on notice of the possibility of its existence. It is incumbent upon a company the size of Allstate to structure its organization in such a way that the right hand knows what the left hand is doing.
Finally, we reach the question of whether the sanctions imposed by the court for Allstate's failure to comply with its discovery orders were proper. Clearly, the court's award of attorney's fees and costs was proper. Fla.R.Civ.P. 1.380(b)(2)(F). But what of striking Allstate's answer to count I and entering default judgment, thereby exposing Allstate to liability for $140,000? As this court said some time ago in referring to the rule providing for the sanction of default where a party fails to make discovery,
[The rule] is not penal. It is not punitive. It is not aimed at punishment of the litigant. The objective is compliance-compliance with the discovery Rules. The sanctions are set up as a means to an end, not the end itself. The end is compliance. The sanctions should be invoked only in flagrant cases, certainly in no less than aggravated cases, and then only after the court has given the defaulting party a reasonable opportunity to conform after originally failing or even refusing to appear. This is unmistakably the trend of judicial thinking in Florida on the "sanction" Rule.
Hurley v. Werly, 203 So.2d 530, 537 (Fla. 2d DCA 1967). See also Ramos v. Sanchez, 375 So.2d 51 (Fla. 2d DCA 1979); Travelers Insurance Co. v. Rodriguez, 357 So.2d 464 (Fla. 2d DCA 1978); In re Estate of Ulm, 345 So.2d 1099 (Fla. 2d DCA 1977). Viewed in light of this standard, it is clear that this portion of the court's order cannot be sustained. Compliance had already been obtained because long before the default was entered, Allstate had delivered the trial summary into the hands of the Biddy's attorney.
The sanction of declaring a default should be reserved for the most egregious conduct. From a corporate standpoint, Allstate wilfully represented that it had furnished its entire file at a time when it had not exercised reasonable care to determine the existence of additional documents. But the record does not support the court's conclusion that Allstate embarked upon a calculated effort to conceal Dowling's trial summary.[2] The most suspicious aspect of Allstate's conduct involved the removal of the trial summary into a separate file. Yet, compliance with Koenig's request to separate the postverdict papers from the balance of the file occurred before the Biddys' *943 counsel ever began discovery and at a time when the existence of the summary had not come into dispute. It is evident that Allstate's failure to acknowledge the existence of Dowling's trial summary stemmed from a bureaucratic breakdown rather than a conscious design to deceive the court or opposing counsel.
In summary, we reverse the adjudication of contempt against Mr. Holloway, the striking of Allstate's pleadings, and the entry of a default judgment against Allstate. However, we affirm the adjudication of contempt against Allstate and remand the case in order that the trial judge may, if he determines it appropriate, impose a fine upon Allstate in an amount not to exceed $2,000. We also affirm the assessment of attorney's fees, and further award the Biddys attorney's fees incurred in connection with this appeal. On remand, the trial judge should set the amount of these fees to be paid by Allstate.
SCHEB and BOARDMAN, JJ., concur.
NOTES
[1] See Stone v. Travelers Ins. Co., 326 So.2d 241 (Fla. 3d DCA 1976), in which the court held that in a bad faith suit all materials in the insurance company's file prepared after final judgment in the original action are subject to production upon a showing of good cause or pursuant to an order of court following an in camera inspection.
[2] Part of the court's indignance can probably be traced to testimony that shortly after Dowling had submitted his trial summary. Mrs. Galeener directed him to omit two paragraphs concerning Allstate's refusal to settle within the limits during the trial. However, the addition of these two paragraphs to the trial summary does not materially strengthen the Biddys' excess claim, and Dowling fully developed Allstate's refusal to settle when he gave his deposition. In any event, Allstate was held in contempt for failing to produce the trial summary, not for causing its alteration.